ORIGINAL

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

**JURY TRIAL DEMANDED**



------------------------------------------------------------X

Ezekiel Frederick, individually

Ezekiel Frederick, as Private Attorney General, and

all statutorily protected "class members"

**Plaintiffs**

Wells Fargo NA et al.; New Penn Financial

LLC, et. al.; Financial Equities Mortgage

Bankers, et al.; Universal Mortgage Bankers,

et al.; Belle Maison Realty, et al.; Mortgage

Electronic Systems; and U.S. Department of

Housing Urban and Development (HUD), et al.;

New York State Department, Licensing Division;

Jeff Doocy; Merissa Serna; Tom Marino; Norman Calvo;

J.R. Nazaire; Sealy Alister; Vivian Annan; Scott

McGoldrick and DOE 1 through DOE 30

**Defendants**

------------------------------------------------------------X

**COMPLAINT**

RICO and RICO Conspiracy;

FHA, 42 USC §§ 3601 *et seq.*;

ECOA, 15 U.S.C. § 1691(a)(1);

Bivens, Bivens Conspiracy;

5th and 14th Amendments; 42

U.S.C. §§§§§§ 1981, 1982,

1985, 1986, 1986, 1988 and

2000d; Title VI and Title VIII;

New York Law violations. . .



ROSS, J.

POLLAK, M.J

## Table of Content

| Page | Sec. | |
|------|------|---|
| 1. | | Parties |
| 7. | | Subject Matter Jurisdiction |
| 13. | | *Sovereign Immunity* |
| 14 | A | RICO and RICO Conspiracy |
| 15 | B | Defendants |
| 16 | C | RICO Statement |
| 22 | D | RICO Predicate Acts |
| 23 | E | RICO False Statements |
| 23. | | (1) Wells Fargo NA |
| 24. | | (2) New Penn Financial LLC |
| 26. | | (3) Financial Equities Mortgage Bankers |
| 28. | | (4) *Universal Mortgage Bankers* |
| 29. | | (5) Belle Maison Realty |
| 35. | F | Racial Discrimination Suits |
| 42. | | (1) Wells Fargo NA |
| 42. | | (2) New Penn Financial LLC |
| 43. | | (3) Financial Equities Mortgage Bankers |
| 44. | | (4) *Universal Mortgage Bankers* |
| 44. | | (5) Belle Maison Realty |

48.                         (6)     Housing Urban and Development

59.                                 *Title VI and VIII*

60.                                 Civil Rights Act

60.                                 Fifth Amendment Due Process

63.          G.          *Supervisory Liability*

64.          H.          Common Law Fraud

                         Exhibits

                                 1-A     *Property-Mortgage Information Sheet*

                                 1-B     Email Thread Transcript of Communications

                                 1-C     Purchase Contract

                                 1-D     *Comparable Sales – 1788 St Johns Pl., Bklyn*

                                 2-A     Property-Mortgage Information Sheet

                                 2-B     Email Thread Transcript of Communications

                                 2-C     Purchase Contract

                                 2-D

                                 3-A     Property-Mortgage Information Sheet

                                 3-B     *Email Thread Transcript of Communications*

                                 3-C

                                 4-A     Email Thread Transcript of Communications

                                 4-B     Acceptance Contract

                                 4-C     Comparable Sales – 964 Madison St., Bklyn

### PLAINTIFFS

Ezekiel Frederick and all "class members"

----------

*Private Attorney General, Ezekiel Frederick*

### BANK RICO ENTERPRISE -- DEFENDANTS

Wells Fargo NA – "Wells"; New Penn Financial – "Penn"; Financial Equities Mortgage
Bankers – "Financial"; Universal Mortgage Bankers – "Universal"; Mortgage Electronic
Systems Inc – "MERS"

### REAL ESTATE RICO ENTERPRISE -- DEFENDANT

Belle Maison Realty – "Belle"; NYS Department of State, Division of Licensing
Services, Complaint Review Office

### FEDERAL RICO ENTERPRISE – Defendant

US DEPARTMENT OF HOUSING URBAN AND DEVELOPMENT (HUD), the Secretary of **(HUD)**,
the Regional and Local Administrators of **(HUD)** responsible for the FHA mortgage program

### INDIVIDUAL DEFENDANTS

Secretary of **(HUD)**, the Regional and Local Administrators of **(HUD)**; Jeff Doocy, NMSLR ID
393341; Merissa Serna; Tom Marino; Norman Calvo; J.R. Nazaire; Sealy Alister; Vivian
Annan; Scott McGoldrick and DOE 1 through DOE 30

1

## Brief and Incorporated Memoranda of Law

1       Plaintiff(s) brings this action against all Defendants under 18 U.S.C. §§ 1964(c)and

2   (d), as well as § 1962(c), a provision of the Racketeer Influenced and Corrupt Organizations

3   Act ("RICO"), 18 U.S.C. §§ 1961-68, pursuant to a scheme and conspiracy under color of

4   federal laws that deprived Plaintiffs of money, real estate, business and property rights in

5   federally guaranteed fair and equal housing opportunities, which also violated *inter lia*, the

6   Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.,*; ECOA, 15 U.S.C. § 1691(a)(1); 42 USC § 1981, §

7   1982, § 1985, § 1986 and § 1988. Plaintiffs further allege state law violations for fraud,

8   conspiracy; aiding and abetting, fraudulent concealment and deceptive business practices

9   act ("New York Consumer Fraud Act").

10  The following causes of action, inter alia, is to

11      1. recover treble and/or compensatory damages for loss of money, property and

12          business, in violation of RICO, 18 USC § 1964 (c) and (d), a provision of the

13          Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-

14          68;

15      2. recover punitive damages for fraud, fraudulent concealment, breach of fiduciary

16          duty, deceptive business practices act ("New York Consumer Fraud Act"), and

17          negligence pursuant to New York Law.

18      3. obtain injunctive relief

2

19        a.  compelling Bank RICO Defendants to originate the various loans

20          requested, for which Plaintiffs otherwise qualified, pursuant to the letter

21          and spirit of the Fair Housing Act and the FHA underwriting guidelines,

22        b.  compelling the establishment of a Ten Billion Dollar ($10,000,000,000.00)

23          mortgage loan set aside for 3-4 family FHA home buyers in the protected

24          class.

25        c.  compelling Real Estate RICO Defendants to stay delivery of the deed for

26          974 Madison Avenue, Brooklyn, NY to any other third party, but to

27          effectuate same to the Plaintiffs as per the terms of the binding offer

28          acceptance, as per Bank RICO Defendants order to originate the mortgage

29          loan, or

30        d.  reversing the improper sale of 964 Madison Avenue, Brooklyn, NY to any

31          third party, and

32        e.  enjoining Defendants from all future similar discriminatory mortgage

33          lending and real estate sales practices.

34        Furthermore, this suit is in part, brought against the Secretary of **(HUD)**, the Regional

35 and Local Administrators of **(HUD)** responsible for the FHA mortgage program, in their

36 official capacities and/or individually; Plaintiffs are all statutorily protected class member

37 home buyers and/or applicants for federally insured mortgages in the State of New York.

38 They sue on behalf of themselves and all other similarly situated class members for inter lia,

4. discrimination by the HUD Defendants themselves and for facilitating, enabling, participating, encouraging and/or perpetuating Bank RICO Defendants' discriminatory practices. See *Gautreaux v. Romney*, 448 F.2d 731, 740 (7th Cir. 1971) (upholding Title VI lawsuit against Secretary of HUD for perpetrating racially discriminatory conduct).

5. to compel the agency to permanently ban the Bank RICO Enterprises and other such violators from

   a. participation in the federally insured mortgage program, and

   b. the secondary market purchase of its mortgages by Fannie Mae,

   in order to *eliminate financial participation by the federal government in illegal racial discrimination* pursuant to certain statutes and regulations, and the United States Constitution as well

6. seeking this Court' issuance of a declaratory judgment: that HUD'

   a. *implementation of policies that*

      i. imposes mortgage insurance premiums on loan applicants with a down payment of 20% or more represents disparate treatment and/or has a disparate impact on the protected class,

      ii. authorizes lenders to overlay FHA guidelines with arbitrary, capricious and discriminatory rules, and/or

4

58    b.  failure to exercise due diligence in affirmatively preventing discrimination

59         against the statutorily protected class, for which the Fair Housing Act

60         ("FHA") and the federally insured mortgage program was created,

61    constitutes an abuse of discretion.

62    7.  seeking this Court' issuance of such orders and directions to the HUD Secretary

63         as are necessary to compel those subordinates charged with administering the

64         FHA mortgage insurance program to affirmatively exercise reasonable care and

65         due diligence that will prevent or substantially reduce the risk of arbitrary and

66         capricious underwriting, leading to the herein complained of discrimination, and

67    8.  seeking a mandatory injunction under the Fair Housing Act, 42 U.S.C. §§ 3601 *et*

68         *seq.,* enjoining HUD itself from future discrimination and/or facilitating,

69         enabling, participating, encouraging and/or perpetuating others in

70         discriminatory lending practices.

71    9.  for a mandatory injunction against

72         a.  imposition of the discriminatory mortgage insurance premium with a

73              down payment of 20% or more, and

74         b.  future failure to affirmatively further the goals incumbent upon its Office,

75    10. such other and further relief as the Court may deem just and equitable, is also

76         requested.

77

78      ***Injury in Fact***

79      It is beyond a doubt that Plaintiffs, who was otherwise eligible for FHA 203k

80      mortgage loans and are denied such loans because of their race, sustained an injury

81      in fact, one that is in no way abstract.

82      Plaintiffs set forth that the benefits of the affirmative duty placed on federal funding

83      agencies, created by 42 USC § 2000d, inure to all persons whose rights to equal treatment

84      are enhanced by the positive efforts of the government. A breach of this duty, either

85      through frank timidity or a more subtle lack of vigilance, violates the underlying right.

86      Because HUD' failure to contribute its crucial share to the collective endeavor of eliminating

87      discrimination, as codified in Title VI; then this failure itself amounts to an actionable

88      violation of that title.

89      In view of the clarity of the Secretary' duty, it seems axiomatic that violations of it

90      through HUD' inaction or indolence must be actionable. Failure of HUD "affirmatively to

91      further the policies of [Title VIII]" is illegal in a fundamental sense. An agent of the federal

92      government is no more at liberty to flout federal law than is a state governmental unit, or a

93      private citizen. *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974);

94      Viewed another way, the failure of HUD to perform its legal duties mandated by §

95      3608(d)(5) constitutes a discriminatory housing practice, in itself. Title VIII is founded on the

96      irrefutable premise that the prevailing structure of the housing market in this country bears

6

97   the stamp of a long history of discrimination in all forms of social life. Present housing

98   opportunities are distorted, both by the after-effects of legally sanctioned racial

99   discrimination, and by the enduring prevalence of discrimination, despite a "complete

100  arsenal of federal authority" aimed at eradicating it. *Jones v. Alfred H. Mayer Co.,* 392 U.S.

101  *409, 417, 88 S.Ct. 2186, 2191, 20 L.Ed.2d 1189 (1968).*

102       The Supreme Court has acknowledged the "enormity of the task of assuring fair

103  housing," *Trafficante, supra,* 409 U.S. at 211, 93 S.Ct. at 367. In view of the scope of the

104  mission, the "main generating force must be private suits, like the instant case, in which the

105  complainants act not only on their own behalf but also `as *'private attorneys general"* in

106  vindicating a policy that Congress considered to be of highest priority.'" *Id.* The Attorney

107  General is charged with enforcing the law against all persons, including federal agencies.

108  *United States v. Nixon, supra.*

109       Similarly, the concept of private attorneys general vindicating Congressional policy

110  logically extends to suits brought to insure that federal agencies comply with their explicit

111  duties created by statute. For this purpose, then, therefore a private right of action exists in

112  the instant case against HUD for violation of its affirmative duties under § 3608(d)(5).

113

7

114   *Subject Matter Jurisdiction*

115        Plaintiffs asserts that this Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C.

116   § 1343(4) (federal question); 5 U.S.C. §§ 701-706, and over the state law claims pursuant to

117   28 U.S.C. § 1367 (supplemental).

118        The second federal question relative to the declaratory judgment and injunction is

119   litigated under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, allows "[a]

120   person suffering legal wrong because of agency action" to seek "judicial review thereof." §

121   702.

122        The APA "embodies the basic presumption of judicial review to one suffering legal

123   wrong because of agency action, or adversely affected or aggrieved by agency action within

124   the meaning of a relevant statute." *Abbott Lab. v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507,

125   18 L.Ed.2d 681 (1967).

126        As interpreted by courts, the APA's "final agency action" requirement for judicial

127   review is quite broad. According to the Supreme Court, the legislative history of the APA

128   judicial review provision "manifests a congressional intention that it covers a broad

129   spectrum of administrative actions and therefore the APA's generous review provisions

130   must be given a hospitable interpretation." *Abbott Lab.,* 387 213*213 U.S. at 140-41, 87

131   S.Ct. 1507

8

132    Furthermore, as defined by the APA, agency action includes agency *inaction,* 5 U.S.C.

133    § 551(13), so that "courts [can] compel an official to exercise his discretion when he fails or

134    refuses to do so." *Suffolk,* 1987 WL 14131 at *3, (holding that HUD's actions were

135    reviewable under the APA in a case where defendants had blocked efforts to build

136    subsidized housing in plaintiffs' town).

137    Courts have also held that "jurisdiction over APA challenges to federal agency action

138    is vested in district courts unless a preclusion of review statute specifically bars judicial

139    review in the district court."

140    Plaintiffs sets forth that HUD's actions do not fall into either of the two exceptions

141    found in 5 U.S.C. § 701(a) *viz:*

142    1.  the underlying statutes preclude judicial review; or

143    2.  agency action is committed to agency discretion by law.

144    See *Heckler v. Chaney,* 470 U.S. 821, 828, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). It is clear

145    that the first exception does not apply because neither the National Housing Act nor the

146    Fair Housing Act specifically precludes judicial review of actions by HUD therefore subject

147    matter jurisdiction is properly vested in this Court.

148    Plaintiffs contends that the second exception also does not apply because although

149    the management of HUD' mortgage insurance program is committed to agency discretion

150    by law. The mere fact that a statute grants broad discretion to an agency does not render

9

151   the agency's decisions completely non-reviewable, under the "committed to agency

152   discretion by law" exception unless the statutory scheme, taken together with other

153   relevant materials, provides absolutely no guidance as to how that discretion is to be

154   exercised.

155        Plaintiffs contend that although HUD was vested with broad discretion to supervise

156   its various programs, its' discretion must be exercised within the framework of the national

157   policy against discrimination in federally assisted housing, to the contrary it must be

158   decidedly in favor of fair housing.

159        In *Heckler,* the Court found that although there is a presumption that judicial review

160   is available under the APA, *"an agency's decision not to prosecute or enforce is a decision*

161   *generally committed to an agency's absolute discretion"* and then "the presumption is that

162   judicial review is not available." *Id.* at 831, 105 S.Ct. 1649.

163        Plaintiffs set forth that in order to rebut the presumption that judicial review is not

164   available, the underlying statute must be drawn so as to have a "meaningful standard

165   against which to judge the agency's exercise of discretion," or, more succinctly, there must

166   be "law to apply." *Id.* at 830, 834, 105 S.Ct. 1649.

167        Plaintiffs set forth that the "law to apply" in this case *inter lia* is the Fair Housing Act,

168   42 U.S.C. §§ 3601-3608. Specifically, the aim of that Act is to "provide, within constitutional

169   limitations, for fair housing throughout the United States." § 3601. The Act prohibits all

10

170    practices that deny housing to persons on the basis of race, color, religion, sex, familial

171    status, or national origin and applies to both intentional housing discrimination and all

172    policies or practices which have a discriminatory effect, even absent intent. *Suffolk Hous.*

173    *Serv. v. Town of Islip,* 1996 WL 75282, at *9 (E.D.N.Y. Feb. 8, 1996) (Glasser, J.). The Act

174    directs the Secretary of HUD to "administer the programs and activities relating to housing

175    and urban development in a manner affirmatively to further the policies" of fair housing. §

176    3608(e)(5).

177        In *N.A.A.C.P.,* 817 F.2d at 149, the First Circuit held that federal courts have the legal

178    authority to review claims that the Secretary of HUD failed to administer HUD programs in a

179    manner to further the policies of fair housing. The plaintiff in that case sued HUD for failing

180    "to enforce constitutional and statutory proscriptions against discrimination in Federally-

181    assisted programs," specifically the administration of Community Development Block

182    Grants and Urban Development Action Grants. *Id.* at 151. The court held that there were

183    adequate standards by which to judge the lawfulness of HUD's *pattern* of conduct:

184        The standard for reviewing the instant pattern can be drawn directly from the

185    statutory instruction to "administer" its programs "in a manner affirmatively to further the

186    policies" of "fair housing." 42 U.S.C. §§ 3608(e)(5), 3601. This standard, like many, may be

187    difficult to apply to borderline instances, yet this Court should be able to determine

188        1.  a clear failure to live up to the instruction over time,

11

189     2.  whether the agency's practice, over time, in respect to this mandate has been

190         "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

191         law." 5 U.S.C. §§ 706(2)(A).

192  Doing so, in the context of a claim of serious failure over time to try to further Title VIII's

193  goals, need not involve the court in "superintend[ing] economic and managerial decisions,"

194  *Hahn v. Gottlieb*, 430 F.2d at 1249, or in reweighing matters that Congress has asked HUD

195  to balance. Rather, the instant case specifically calls for a more straightforward evaluation

196  of whether agency activity over time has furthered the statutory goal, and, if not, for an

197  explanation of why not and a determination of whether a given explanation, in light of the

198  statute, is satisfactory.

199         Here, Plaintiffs points not to general but to at least four specific instances of agency

200  action (or inaction) with four different banks, whereby HUD' failure to oversee their lending

201  practices, in effect enabled arbitrary, capricious and discriminatory application of the FHA'

202  federally assisted lending program and the Fair Housing Act itself, resulting in injury to

203  Plaintiffs and similarly situated others. Plaintiffs seeks monetary damages from the private

204  parties, but only broad-based ***declaratory*** and ***injunctive*** relief is sought against HUD, in

205  that there are specific instances through which HUD's actions may be evaluated, making

206  Plaintiffs here more like the plaintiff in *N.A.A.C.P.*

207         Plaintiffs here challenge HUD's pattern of neglect in overseeing its mortgage

208  insurance programs and/or warn the unsuspecting public with due diligence. This Court

*12*

209  may determine whether HUD's failure to oversee its mortgage insurance programs to low,

210  moderate and middle income minority applicants – a protected class, in targeted and red-

211  lined areas, constitutes an abdication of the Secretary's duty to administer HUD programs in

212  a manner to further the policy of the FHA, specifically, to provide fair housing throughout

213  the United States. In addition to the Fair Housing Act, several cases interpreting the Act also

214  provide the Court with law to apply. See, e.g., N.A.A.C.P. v. Kemp, 721 F.Supp. 361

215  (D.Mass.1989) (on remand from the first circuit, fashioning declaratory and injunctive relief

216  for HUD's failure to administer housing programs to further policies of Fair Housing Act).

217

218  **SOVEREIGN IMMUNITY**

219  This doctrine does not bar a suit such as this which is challenging alleged unconstitutional

220  and unauthorized conduct by a federal officer. Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10

221  L.Ed.2d 15 (1963); Bolling v. Sharpe, supra; Shannon v. **HUD**, 436 F.2d 809 (3 Cir., 1970). See

222  also: Powelton Civic Home Owners Association v. **HUD**, 284 F.Supp. 809 (E.D.Pa., 1968);

223  Hicks v. Weaver, supra.

224

Causes of Action

***Claims One and Two***

## A. **RICO and RICO Conspiracy**

1                    Allegations

2          Plaintiffs claim that non-federal and individual Defendants violated 18 U.S.C. § 1962(c), (d)

3     and brings this action pursuant to 18 U.S.C. § 1964(c), (d). Plaintiffs base these claims on

4     allegations that all individual Defendants, conspired, agreed among and between themselves,

5     confederated, combined together, aided, abetted, assisted, advised, attempted to and did,

6     participate in the management and operations of their respective RICO Enterprises, each directly

7     engaged in, attempted, caused or furthered racketeering activity consisting of multiple acts of

8     mail, wire and honest-services fraud in furtherance of several individual schemes to discriminate

9     and deprive Plaintiffs and similarly situated other minorities of money, property and business, as

10    well as fair and equal housing, constituting a pattern of racketeering activities of which affected

11    interstate or foreign commerce all through systemic discriminatory lending and sales customs,

12    policies or actual practices, causing injuries, all in violations of Sections 1962(a) and (c). *See* §

13    1962(d)

14         Plaintiffs bring this federal RICO class action on behalf of themselves and of similarly

15    situated other members of the statutorily "protected-class" that, between November 1, 2006 and

14

16   December 31, 2011 (the "Class Period"), applied for and was unlawfully denied property and/or

17   federally insured FHA mortgage loans, and were thereby damaged.

## B. Defendants

The Bank RICO Defendants in this action are

**Wells Fargo NA, 2710 Wells Fargo Way, Minneapolis, MN 55467**

Wells Fargo NA, CEO DOE 1, Wells Fargo NA, CFO DOE 2, Wells Fargo NA, VP of Operations, DOE 3

Supervisor DOE 4 and Jeff Doocy, each of the above, in their official capacities and individually.

**New Penn Financial, LLC; 425 Broadhollow Road, Suite 210, Melville, NY 11747**

New Penn Financial LLC, CEO DOE 5,; New Penn Financial LLC, CFO DOE 6, New Penn Financial

LLC, VP of Operations DOE 7 Supervisor DOE 8 and Merissa Serna, each of the above, in their

official capacities and individually.

**Financial Equities Mortgage Bankers; 1025 Old Country Road, Westbury, NY 11590**

Financial Equities Mortgage Bankers, CEO DOE 9, Financial Equities Mortgage Bankers, CFO DOE

10; Financial Equities Mortgage Bankers, VP of Operations DOE 11; Supervisor DOE 12; and Tom

Marino,  each of the above, in their official capacities and individually.

**Universal Mortgage Bankers; XXX Livingston Street, Brooklyn, NY 112XX**

15

Universal Mortgage Bankers, CEO Calvo ("Calvo"); Universal Mortgage Bankers, CFO DOE 13;

Universal Mortgage Bankers, VP of Operations DOE 14; each of the above, in their official

capacities and individually.

**Belle Maison Realty; 990 Stewart Avenue, Suite 660, Garden City, NY 11530**

Belle Maison Realty, CEO J.R. Nazaire ("Nazaire"); Belle Maison Realty, CFO DOE 15; Belle Maison

Realty, VP of Operations DOE 16; each of the above, in their official capacities and individually.

**Mortgage Electronic Systems Inc (MERS), Flint Michigan**

**NYS Department of State, Division of Licensing Services,(NYSDOS) Complaint Review Office, 123**

**William Street, 19th Floor, New York, NY 10038-3804**; Scott McGoldrick, Senior Licensing

Investigator, Complaint Review; c/o NYSDOS

**U.S. Department of Housing Urban and Development (HUD), Washington, DC**

HUD Secretary, Doe 17; HUD Regional Director, Doe 18 and HUD Local Director, Doe 19, in their

official capacities and individually.

Wells Fargo, New Penn, Financial Equities and Universal collectively, the **"Bank RICO**

**Enterprises"**; Belle Maison Realty (BMR) and the NYSDOS, Division of Licensing, collectively the

**"Real Estate RICO Enterprise"**; and the Department of Housing Urban and Development (HUD),

the passive **"Federal RICO Enterprise"** collectively: the "RICO Enterprise Defendants"; and

Individual Defendants, collectively: altogether the "Defendants."

16

Plaintiffs principally allege that Defendants intentionally or with reckless disregard materially misled, participated in, discriminated against, deprived and/or defrauded Plaintiffs in respect of money, business and real estate or mortgage loans.

## C. **RICO STATEMENT**

1       Each RICO Enterprise Defendant and some of its officers, shareholders and employees

2 conspired, agreed among and between themselves, confederated, combined together, aided,

3 abetted, assisted, advised, attempted to and did, participate in the management and operations

4 or "exercised broad discretion" in aiding, abetting, assisting and carrying out the objectives" of

5 their respective RICO Enterprises; through at least two predicate racketeering acts of mail fraud,

6 wire fraud, constituting a pattern of racketeering activities of which affected interstate or foreign

7 commerce, all in furtherance of RICO schemes, pursuant to discriminatory lending customs,

8 policies or actual practices, which was based on Plaintiffs' race, the racial composition of their

9 neighborhoods, religion and/or national origin, by

10     1. redlining communities, and/or

11     2. denying their mortgage loan applications,

12 in five separate but related instances that prevented the Plaintiffs from purchasing residences for

13 which they otherwise qualified. HUD and Bank RICO Defendants actions

17

3. caused class members, making a 20% down payment to pay add mortgage insurance premiums, for which the aggregate amount is yet to be determined through discovery,

4. caused Plaintiffs the economic loss of approximately One Million Three Hundred Nine Thousand Dollars ($1,309,000.00) in equity and/or value pursuant to two separate purchase agreements,

5. impaired Plaintiffs' credit scores and financing abilities. and

6. deprived Plaintiffs and similarly situated others of property and property interest in fair and equal housing ownership,

all in violation of 18 USC § 1962(a) and (c). *See* § 1962(d)

Plaintiffs contend that each individual Defendant was jointly and severally liable for the conduct of their joint criminal undertaking, even if they did not perform "managerial roles," in the various RICO Enterprises or was not of the class of person that performed certain acts, but nonetheless

1. "exercised broad discretion" in aiding, abetting assisting and carrying out the objectives of the RICO Enterprise. Burden, 600 F.3d at 219 (quoting United States v. Diaz, 176 F.3d 52, 92 (2d Cir. 1999)), or

2. knew the general nature of the RICO conspiracy and that the conspiracy extended beyond their individual roles, even if incapable of committing the substantive offense.. United States v. Zichettello, 208 F.3d 72, 99 (2d Cir. 2000) (quoting United States v. Rastelli, 870 F.2d 822, 828 (2d Cir. 1989)); see also Salinas v. United States, 522 U.S. 52, 64 (1997).

18

34   furthered the objectives of the RICO Enterprises by committing multiple acts of mail fraud and

35   wire fraud, in violation of 18 USC § 1341 and § 1343.

36       In execution and furtherance of their unlawful schemes, the Real Estate and Bank RICO

37   Defendants willfully,

38   1.  incorporated the FHA programs in their Internet based advertisements,

39   2.  accepted, obtained or caused the transmission of mortgage applications and credit

40       reports, through

41       a.  the U.S. Postal Service, and

42       b.  interstate wires (fax and emails);

43   that was addressed to and/or from others with out-of-state headquarters and/or residences.

44       As HUD representatives, each Bank RICO Enterprise Defendant was an approved mortgage

45   lender in the FHA mortgage insurance program, whereby they are required to comply with all

46   federal regulations and procedures governing the ECOA and/or the Fair Housing Act ("FHA"); real

47   estate sales, rental or placement practices; and/or setting forth eligibility guidelines for HUD

48   insured mortgage loans.

49       The Defendants willfully and deliberately engaged in

50   1.  redlining communities, and/or

51   2.  targeting those with certain property demographic and socio-economic backgrounds, and

52   3.  the addition of a fatal over-layer of conventional mortgage underwriting impediments for

53       the intended purpose of

19

a.  circumventing the Fair Housing Act (FHA), and

b.  ultimately depriving Plaintiffs of fair housing opportunities,

all through a pattern of racketeering activities.

"Redlining" is an unlawful discriminatory anti-lending practice that has a disparate racial impact, whereby low to moderate-income racial minorities are repeatedly victimized by the imposition of badges and incidents of slavery.

The Real Estate and Bank RICO Defendants – licensed private corporations their corporate officers, shareholders, stockholders, employees, as well as individuals, *in positions of trust,* at times, acting within the scope of their employment and at other times, outside the lawful scope of that employment; but at all times acting on behalf of and in furtherance of the goals and objectives of their respective RICO Enterprises.

Plaintiff hereby sets forth that

1.  predicate acts of racketeering activity are related, and that they amount to or pose a *threat of continued criminal activity.*

2.  the Defendants did participate, attempt, aid and abet, conspired to aid, abet and assist in the  (a) management of the affairs of the RICO Enterprises, and (b) execution *and furtherance of predicates acts,*

3.  the continuity of the RICO Enterprises are pursuant to open-ended agreements of intermediate term racketeering activities in furtherance of the discriminatory lending *and real estate sales schemes, which are based in their customs, policies, usages and* actual practices. This fact reveals RICO Enterprises, with no intention of stopping once

75       it meets an immediate goal and therefore the conduct, is capable of repetition, yet

76       escaping judicial review.

77   4. predicate acts are sufficiently similar, numerous and temporally related to

78      demonstrate a pattern of racketeering activity that poses a threat of continued

79      criminal activity.

80   5. it is beyond a doubt that Plaintiffs, who was otherwise eligible for FHA 203k mortgage

81      loans and are denied such loans because of their race, already sustained and is under

82      threat of continuing 'injury in fact', one that is in no way abstract, but concrete and

83      particularized

84   7. they suffered losses caused by the Real Estate and Bank RICO Defendants' acts,

85      including but not limited to, the

86      a. Seven Hundred Sixty Nine Thousand Dollars ($769,000.00) representing the

87         completed property value of 1788 St Johns Place, Brooklyn, NY,

88      b. Five Hundred Sixty Nine Thousand Dollars ($569,000.00) representing the

89         completed property value of 964 Madison Avenue, Brooklyn, NY,

90      c. impaired Plaintiffs' credit scores and credit worthiness in securing

91         i. primary home purchase loans,

92         ii. purchase financing for non-primary residential and/or commercial

93            properties, and

94         iii. lower rate – credit cards, installment financing, revolving credit account

95            and insurance.

96          d.  impaired Plaintiffs' contractual obligations to simultaneously start and finance

97             two businesses, one to handle "real estate acquisitions and development" and

98             the other in "general construction and construction management" to handle

99             proprietary renovation contracts,

100    all as the result of the Bank RICO Defendants' fraudulent mortgage loan denials.

101      **8.**  the award of treble, compensatory and punitive damages, as well as injunctive relief,

102        attorneys' fees, costs and fees associated with this action pursuant to 18 U.S.C. § 1964

103        vis-à-vis, will remedy Plaintiff(s)' injuries in fact. Moreover, these damage awards are

104        most likely to prevent future similar injuries by Bank and Real Estate RICO Defendants'

105        pattern of criminal racketeering activity.

## D. RICO Predicate Acts

### Mail and Wire Fraud

1        Plaintiff(s) sets forth that all classes of Defendants committed RICO predicate acts of mail

2  and/or wire fraud some in execution, of the discriminatory lending scheme, as herein stated in

3  particularity, pursuant to the heightened pleading requirement of Rule 9(b) and other acts of mail

4  and/or wire fraud in furtherance of the discriminatory lending scheme, which does not implicate

5  the Rule 9(b) requirement.

1

## E. **False Statements**

2      Plaintiffs allege that mail and email communiqués contained materially false statements

3  that was known or should have been known to be false at the time made, including but not

4  limited to, material omissions and material misrepresentation made by **Bank RICO Enterprise**

5  employees:

6

### (1) Wells Fargo NA

7      Wells Fargo NA headquartered in ***Minneapolis, Minnesota***; assigned *Loan Officer and*

8  *Renovation Specialist,* **Jeff Doocy**, to evaluate, package and issue the requested application

9  preapproval letter prior to submission to its underwriting department.

10      For RICO jurisdictional purposes, Defendants caused the transmission of Plaintiffs credit

11  reports from Experian, Transunion and Equifax, respectively located in XX, XX and XX

12      On Wednesday, December 14, 2011 at 6:45 pm, "Frederick Plaintiffs," submitted an

13  application for FHA 203k mortgage financing to Wells Fargo NA. Plaintiffs sought a Seven

14  Hundred Forty Thousand Dollar ($740,000), FHA 203k mortgage for the acquisition renovation

15  and conversion of a vacant 3 story—three family building located at 1788 St Johns Place,

16  Brooklyn, NY 11233, into a 4 story—four family residence, whereby the property provided more

17  than adequate collateral.

18          In email and telephone communications beginning on, about and between December 10,

19    2011 and December 31, 2011 Mr Doocy misrepresented that

20        1.  the FHA program did not permit mortgage loans for residential

21            1.  mixed-use one to four family primary residence,

22            2.  three to four family properties which included use of 85% of the rental income for

23                mortgage qualifying purposes.

24            3.  applicants that has a qualifying Debt to Income (DTI) ratio above 43%, without

25                having six months of non-gifted reserves in the bank for the three prior months.

26        2.  Plaintiffs' did not qualify for an FHA mortgage

27            1.  because the initial DTI was above 60%,

28            2.  unless the requested loan amount was substantially reduced in order to meet

29                qualifying ratios,

30        See **Exhibit 1-B**, the complete email thread transcript of communications sent between

31        the parties and discriminatory actions taken by Wells Fargo NA, et al., which is hereby

32        incorporated by reference, as though set forth in full force and affect.

33                                    **(2) New Penn Financial**,

34        New Penn Financial LLC., is headquartered in Pennsylvania;

35          For RICO jurisdictional purposes, Defendants caused the transmission of Plaintiffs credit

36    reports from Experian, Transunion and Equifax, respectively located in XX, XX and XX

37      On or about September 10, 2011 New Penn Financial assigned Ms. Merissa Serna, its

38  senior loan officer, to and she did evaluate, package and issue the requested application

39  preapproval letters preliminary to full submission to New Penn' underwriting department.

40      On Friday, October 7, 2011 at 14:27 pm "Frederick and Afroz Plaintiffs," terminated their

41  prior relationship with the assigned Senior Loan Officer, Merissa Serna, at New Penn Financial,

42  LLC, for what appeared at the time, to be dilatory and unprofessional business practices. Plaintiffs

43  wrote:

44      This communiqué is to "terminate the mortgage service request" and

45      to inform you that I find your failure to communicate with me

46      extremely unprofessional, in that it has cost the loss of an entire

47      week' progress.

48      I have two other lenders just waiting for a go signal to provide

49      service, however, I gave you the benefit of time and opportunity.

50      If you could not or the bank would not make an accommodation, a

51      simple No was in order!

52

53      This also reflects directly on your immediate supervisor' failure

54      to properly train you in professional decorum.

55      Subsequent to the termination letter, on Friday, October 7, 2011, "Frederick and Afroz

56  Plaintiffs," was convinced by Ms. Serna' superior to submit two FHA mortgage applications and

57  did thereby obtain two separate pre-qualification letters for (2-4 family) FHA streamlined

58    mortgage loans for Three Hundred Eighty Nine Thousand Eight Hundred Sixty Dollars

59    ($389,860.00). On Friday, October 7, 2011 at 16:15 pm, Plaintiffs wrote:

60        Attached you will find property specific 1003s for the FHA preapprovals.

61        In type, sum and substance, we now focus our discussion on the "third" FHA 203k

62    mortgage application submitted on behalf of Daniel I. Frederick and his prequalification letter

63    issued on November 4, 2011 for Five Hundred Fifty Six Thousand Dollar ($556,000), for the

64    purpose of acquiring, renovating and converting a vacant three family building located at 1788 St

65    Johns Place, Brooklyn, NY 11233, into a four family residence, whereby at all times, the property

66    represented adequate collateral.

67        In email, fax and telephone communications on, about and between September 10, 2011

68    and December 13, 2011 Ms. Serna misrepresented that the FHA program did not permit

69    mortgage loans for residential

70    1.  mixed-use one to four family primary residence,

71    2.  conversion from a three to four family primary residence,

72    3.  renovations costing over Thirty Thousand Dollars ($30,000.00),

73    4.  Co-habitation of two unmarried immediate family members, in one of four, 4-bedroom

74        apartments for mortgage qualifying purposes.

75    See **Exhibit 2-B**, the complete email thread transcript of communications between the parties

76    and discriminatory actions taken by New Penn Financial, et al., which is hereby incorporated by

77    reference, as though set forth in full force and affect.

78

79                        **(3) Financial Equities Mortgage Bankers,**

80          Financial Equities Mortgage Bankers headquartered in New York; assigned *Sales Manager,*

81    **Tom Marino** to evaluate, preapprove and underwrite Plaintiffs, Frederick and Afroz' FHA

82    mortgage loan applications.

83          For RICO jurisdictional purposes, Defendants caused the transmission of Plaintiffs credit

84    reports from Experian, Transunion and Equifax, respectively located in XX, XX and XX

85          As a result of prior experiences with New Penn Financial LLC, Plaintiffs engaged in

86    extensive pre-application discussions and simulations.  All was well until submission of the

87    completed mortgage application and supporting documents, including photo identification --

88    evidencing the Plaintiffs' race along with particular socio-economic dynamics then the

89    discrimination, misrepresentations and sabotage began.

90          In email and telephone communications beginning on, about and between October 10,

91    2011 and October 31, 2011 and more specifically, only after submission of a copy the driver'

92    license, as photo identification along with one of three proto-typical Uniformed Mortgage

93    Applications on or about October 25, 2011 containing other indicas of race, nationality and socio-

94    economic characteristics of "hot zoned" or "red-lined" areas. Mr. Marino misrepresented that

95    the FHA program would not approve these types of mortgage loans because for underwriting

96    purposes, Plaintiff(s)

97       1.  did not have at least Fifty Thousand Dollars ($50,000.00) of seasoned reserve funds in a

98           bank account, notwithstanding a very large compensating 25% down payment of One

99           Hundred Ninety Thousand Dollars ($190,000.00) – [see Exhibit 3-A, the lender' marked-up

100          copy of Plaintiffs' Property-Mortgage Information Sheet.]

101      2.  did not earn at least Eighty-Five Thousand Dollars ($85,000.00) of 1040 income sufficient

102          to carry the property, without regard for the otherwise qualifying rental income, and

103      3.  worked for a Temp Agency, notwithstanding six years of continuous employment, four

104          years of which was at the present employer,

105  See **Exhibit 3-B**, the email thread transcript of communications between the parties and

106  discriminatory actions taken by Financial Equities Mortgage Bankers, et al., which is hereby

107  incorporated by reference, as though set forth in full force and affect.

108

109                          **(4) Universal Mortgage Bankers**,

110      Universal Mortgage Bankers, headquartered in Brooklyn, NY assigned Norman Calvo to

111  receive, evaluate and originate Plaintiffs FHA mortgage loans.

112      From, on or about September 1, 2011 Defendants caused Plaintiffs to identify and make

113  contact with them through a website called Scotsman, based in the state of Arizona. Plaintiffs

114  initiated several telephone calls and emails with Norman Calvo, President of Universal Mortgage.

115      Based on Mr. Calvo' extensive knowledge and position in the local mortgage lending

116  industry and at his invitation, Plaintiffs submitted three mortgage applications by email.

117  However, once the completed mortgage application and supporting documents, including photo

118  identification was submitted, evidencing the Applicants' race along with particular socio-

119  economic dynamics, the discrimination began.

120      Incident to his receipt and review, Mr. Calvo initiated an unfriendly telephone

121  conversation on or about September 10, 2012 in which he discussed the economic dynamics

122  contained in the mortgage applications. At the conclusion of that conversation, Mr. Calvo willfully

123  and intentionally discriminated against Plaintiffs by, affirmatively declining to do business with

124  any of the applicants and stated that he was going to destroy the mortgage applications and

125  supporting documents, as if they never existed.

126      In telephone communications beginning on or about September 7, 2011 **Mr. Calvo**

127      1.  expressed significant disapproval of the applications on their face,

128      2.  stated that there was some misunderstanding on the telephone calls,

129      3.  misrepresented that the FHA program would not approve the Plaintiffs' mortgage

130         loans, and

131      4.  blatantly refused to service the Plaintiffs, stating that he was going to destroy the

132         mortgage applications as if they never existed.

133      **False statements made by or attributable to the Real Estate RICO Defendants**

134

135                  **(5) Belle Maison Realty**

136     Belle Maison Realty (BMR), headquartered in Long Island, New York; *Associate Broker*, **Mr.**

137     **Alister.** *Plaintiffs set forth*

138          **1.** the existence of a dual agency between Defendant BMR and

139                **a.** *Vivian Annan, the Defendant property owner, and*

140                **b.** Mortgage Electronic Systems Inc, (MERS) the Defendant mortgage lender,

141                     headquartered in Flint, MI.

142          **2.** for RICO jurisdictional purposes that BMR did use and cause the use of mail and

143               interstate wires to negotiate the short sale and communicate purchase offers to

144               MERS, in furtherance of their scheme that defrauded Plaintiffs.


145     Beginning on, about and between November 1, 2011 and December 3, 2011 made the following

146     material

147          3. ***omissions*** in advertisements on their website based in XX, Internet listing sites and

148               presentments of the property sale to Plaintiffs – that the

149                a.  terms not readily known to Plaintiffs, e.g.

150                b.  a "time of the essence" clause,

151                c.  the existence of known "liens of record" against the owner and/or property,

152                d.  the sale will be "auction styled"  to the highest bidder, and

153                e.  only the highest bid will be submitted to the seller/bank

154          4. ***misrepresentations*** by telephone to Ezekiel Frederick, with the intent to deprive

155               and/or defraud Plaintiffs of money or property;

156                a.  that the binding "full offer acceptance" will be submitted immediately to the

157                     owner, when in fact he had no intention on presenting and actually did not

158         present Plaintiffs' November 23, 2011 acceptance, nor their increased

159         *December 1, 2011 auction styled counter-bid to the Seller.*

160         on December 1, 2011; that

161      b.  Plaintiffs' written binder acceptance for Two Hundred Ninety Nine Thousand

162         Dollars ($299,000.00) was required to be

163         i.  subject to a "time of the essence" clause – when in fact, the property turned

164            out to be a "short sale," subject to the hindering bank approval process, and

165         ii.  subject to "liens of record" against the owner and/or property,

166         when in fact these were more "onerous and adverse terms of sale" that was not

167         revealed or discussed prior to the Plaintiffs property inspection and binding full

168         acceptance.

169      c.  the property was no longer available. This was not true in the sense that it was

170         withdrawn by the Seller prior to Plaintiffs' binding acceptance in writing and proffer

171         of a good-faith check, but in fact, it was available and contracted to a subsequent

172         Offeror with what was purported to be a Two Thousand Dollar ($2,000.00) higher

173         bid.

174      d.  the bidding process was closed, therefore, Plaintiffs' new instant offer of

175         $305,000.00, could not and would not be accepted for submission to the Seller,

176         when in fact, as of December 1, 2011 the owner and/or foreclosing bank did not

177         even receive and/or approve any short sale. Pursuant to the Kings County Board of

178         Realtors, the ruling custom is to submit all offers up until closing.

Furthermore, Alister clearly

3. knew the falsity of these representation(s), at the time when the statements were made,

4. expected Plaintiffs to justifiably rely upon such misrepresentation(s), to their detriment,

5. caused injuries as per Section C, Ln 86 through 101,

6. stated that it was not him, but his Broker, Mr. Nazaire that is personally responsible for the complained of course of events.

See **Exhibit 4-B**, the email thread transcript of communications between the parties and discriminatory actions taken by Belle Maison Realty, et al, which is hereby incorporated by reference, as though set forth in full force and affect.

------------------------------

Plaintiffs sets forth that representations from all the above officers and/or employees of RICO Enterprise Defendants above are false,

1. for reasons stated, and/or

2. in that Plaintiffs, definitively qualified on all points of controverted underwriting criteria, because FHA guidelines affirmatively sets forth each of these criteria for mortgage qualifying purposes.

These false and fraudulent statements served as the pretext for discriminatory application of otherwise *"facially neutral,"*

32

199            1. conventional mortgage underwriting scrutiny, leading to loan denials, and

200            2. real estate sales policies, leading to suppression and/or rejection of Plaintiffs'

201              acceptance binder,

202 vis-à-vis non-African American loan applicants or real estate purchasers. Through this misconduct

203 Bank RICO Defendants and Real Estate RICO Defendants affirmatively

204            1. disallowed Plaintiffs' rightful reliance, as per FHA proviso, to include eighty-five

205              percent (85%) of rental income for 3-4 family homes for mortgage qualifying purposes

206              – Wells Fargo

207            2. misapplied what was represented to be FHA' maximum 43% Debt to Income (DTI)

208              ratio, above which compensating factors were required, when in fact FHA' maximum

209              DTI is 47% – Wells Fargo

210            3. required Plaintiffs to demonstrate possession of six months of non-gifted cash

211              reserves, in a bank account for the prior three months, when no such FHA

212              requirement existed – Wells Fargo

213            4. disallowed Plaintiffs' six years of continuous employment, four of which was with one

214              employer through a temp agency, when FHA has no such employment restriction for

215              mortgage qualifying purposes – Financial Equities

216            5. disallowed Plaintiffs' otherwise seasoned credit profile because it did not include a

217              substantial auto loan, when FHA has no such exclusion, but authorizes alternative

218              credit sourcing – Financial Equities

219            6. disallowed the co-habitation of two immediate and unmarried family members, in

220              one of four 4-bedroom units, when FHA rules permit, rather, requires that co-

221      borrowers attest to under penalty of perjury and actually occupy the mortgaged

222      premises for one year, whether or not living in one or two units – *New Penn*

223   7. arbitrarily reduced Plaintiff' income by the amount of unreimbursed expenses claimed

224      on Schedule A of the 1040, when FHA has no such requirement – *Financial Equities*

225   8. restricted Plaintiffs' conversions of the property from three units to a four family

226      residence, when FHA has no such restriction – *New Penn*

227   9. restricted Plaintiffs' ability to make substantial renovations exceeding Thirty Thousand

228      Dollars ($30,000.00) through the FHA 203k loan, when FHA has no such restriction,

229   10. disallowed the FHA 203k mortgage for mixed-use residential properties, when FHA

230      provides for same – *New Penn and Wells Fargo*

231   all intended to for the purpose of

232   1. denying Plaintiffs' mortgage applications. Bank RICO Defendants did not provide Plaintiffs

233      with any legitimate reasons for rejecting their mortgage applications. In fact, RICO

234      Defendants' subjective application or unlawful misapplication, as the case may be, of

235      a. FHA' 3-4 family mortgage underwriting criteria, and

236      b. real estate sales customs, policies or actual practices,

237   against African Americans, certainly results in or will result in disproportionately

238      c. higher rates of mortgage loan denials, and

239      d. lower rates of homeownership,

240   2. fraudulently causing the combined loss of or defrauded Plaintiffs of One Million Three

241      Hundred Thirty Eight Thousand Dollars ($1,338,000.00) of contract equity/completed

34

242        value, real estate and business, as well as property interest in the Fair Housing Act'

243        guarantee of fair ownership opportunities.

244        Bank RICO Defendant—New Penn issued preapproval letters for the sole purpose of

245        empowering Plaintiffs to make credible purchase offers on 3-4 family properties resulting

246        in a binding full acceptance offers/contracts for properties located at 1788 St Johns Place

247        and 964 Madison Street, both in Brooklyn, NY, purely based on the instant expectation of

248        securing FHA 203k mortgage loans.

249    all in violation of 18 U.S.C. § 1964 (c) and (d); Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.,*; ECOA,

250    15 U.S.C. § 1691(a)(1); 42 USC § 1981, § 1982, § 1984 and § 1985; state law fraud, conspiracy;

251    aiding and abetting, fraudulent concealment and deceptive business practices act ("New York

252    Consumer Fraud Act").

253

## F. RACIAL DISCRIMINATION – FACTUAL ALLEGATIONS

Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*; ECOA, 15 U.S.C. § 1691(a)(1); Bivens, Bivens Conspiracy;

Equal Protection, Procedural and Substantive Due Process Clauses of the 5th Amendment as

incorporated in the 14th Amendment; as well as 42 USC §§§§§ 1981, 1982, 1985, 1986 and 1986; Title

VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.,* Title VIII of the Civil Rights Act of 1968, 42

U.S.C. § 3601 *et seq.,* the Civil Rights Act of 1871, 42 U.S.C.

Plaintiffs allege that the Defendant Enterprises and some of its officers, shareholders and employees conspired, agreed among and between themselves, confederated, combined together, aided, abetted, assisted, advised, attempted to and did

1. engage in discriminatory lending scheme(s) that deprived them of property and property interest in money, real estate, business, contracts; fair housing opportunities; equal protection; rights, privileges and immunities under the law, and

2. fail to prevent the discriminatory lending schemes that resulted in the deprivation of property and property interest in money, real estate, business, contracts; fair housing opportunities; equal protection; rights, privileges and immunities under the law,

thereby imposing the badges and incidences of slavery,

Plaintiffs set forth that Bank RICO Defendants, as HUD authorized lenders,

1. acted under color of federal law

   a. at times, pursuant to HUD' official right, as if accorded, a full delegation of legislative authority, to write an over-layer of substantive guidelines for carrying out and facilitating the federally funded and HUD administered FHA program, and

   b. at other times, outside the scope of any legitimate purpose or lawful function, imposing substantive guidelines that contravened *inter lia.,* the Fair Housing Act' (FHA) anti-discriminatory purpose,

2. acted as if their de facto governmental decisions were final and unappealable,

in that Plaintiffs were not provided any form of <u>notice</u> related to procedural due process or the

<u>opportunity to be heard</u>.

Plaintiffs set forth that the respective racial population of the subject neighborhoods was

and still is made-up of over 80 percent minorities (African-Caribbean Americans, Middle

Easterners and others) and alleges both

1. disparate intent or impact, and

2. intended or actual disparate treatment ,

causes of action, contending that all classes of Defendants have engaged in unfair and

discriminatory business practices that have prevented them and similarly situated others from

1. obtaining FHA mortgages for 3-4 family residences, and

2. purchasing 3 to 4 family homes.

Plaintiffs herein describes the symbiotic relationship between Bank RICO Defendants and

the federal government, satisfying the threshold requirement of governmental actions for the

protections of the 5th Amendment Due Process, as well as the equal protection, procedural and

substantive due process clauses of the 14th Amendment, as follows:

Defendants are required to comply with all federal regulations and procedures governing

the ECOA and Fair Housing Act ("FHA"); real estate sales, and setting forth eligibility

guidelines for HUD insured mortgage loans.

37

In support of their disparate impact claim, Plaintiff alleges that all classes of RICO Enterprise Defendants engaged in certain practices that has disproportionate impacts on the African-Caribbean American protected-class of credit, loan and home-buying applicants.

For example,

1. Bank RICO Defendants routinely discriminate against and reject mortgage loan applications for the acquisition and/or rehabilitation of 3-4 family properties, whenever

   a. the applicants are African-Caribbean Americans or of African descent, and/or

   b. the neighborhood demonstrates related socio-economic characteristics – in other words "hot zones" or "redlined areas," and

   c. the applicants had a supplemental reliance on FHA' provisional inclusion of Eighty-five (85%) percent of the rental income for mortgage qualifying purposes,

2. Real Estate RICO Defendants normally demonstrates a particular bias against African American home buyers vis-à-vis whites and other minority home buyers; in the form of price and/or terms of purchase,

3. Federal RICO Enterprise Defendants, did imposed new facially neutral but discriminatory policy changes, which has a disparate impact on a protected class of moderate to median income loan applicants, because it increases the monthly payment on a 30 year mortgage by 1.1%, to cover a "mortgage insurance premium," notwithstanding a down payment equal to or greater than 20%.

Plaintiffs hereby challenges the above policies as

1. making loans unavailable or on terms that are more onerous on the protected class than conventional mortgage underwriting prerequisites, and

2. having a disparate and disqualifying impact on a protected class of moderate to median income earners that almost always choose 30 year mortgages, simply because they cannot afford 15 year mortgages, and

3. providing a skewed reward of a (1.1%) lower monthly cost, to higher income non-class members that can afford a 15 year mortgage.

For mortgage qualifying purposes, these rules actually penalizes the protected class of loan applicants with moderate to median incomes that could afford it the least, by saddling them with the added premium while rewarding non-class member loan applicants with exemptions.

> Example: Under the old policy, a median income member applicants of the protected class living in New Yorker that could make a 20% down payment on an affordable 30 year mortgage with a DTI of 47%, would be exempted from the _disqualifying higher cost_ burden of mortgage insurance; However, under the new discriminatory policy that eliminates this exemption, the applicant would no longer income qualify, for the same mortgage loan. The new policy has a disparate impact on the protected class of loan applicants.

All of the above policies disproportionately affect African-Caribbean Americans.

Plaintiffs' hereby demonstrates that the Real Estate, Bank and Federal RICO Enterprise Defendants' facially neutral sales customs and lending policies are to the contrary, in actual practice being applied in an arbitrary and capricious manner that _"has and will predictably_

continue to results in racial discrimination" against African-Caribbean Americans. Defendants adopted their respective policies or actual practices because of animus, specifically toward African-Caribbean Americans and other minorities in general.

In support for these intended or actual disparate impact and treatment claims, Plaintiffs contend that they were discriminated against notwithstanding the fact that Plaintiffs

1.  meet the seller' Two Hundred Ninety Nine Thousand Dollars ($299,000.00) asking price by written acceptance, only to be defrauded of the contractual equity eight days later. After inspecting the property, Plaintiffs were now required to purchase on new terms that was too onerous to meet, because of race, as per Real Estate RICO Defendant' customs, policies or actual discriminatory sales practices.

2.  were equally or more qualified than non-African American FHA applicants, however, pursuant to Bank RICO Defendants' customs, policies or actual practices, the loan officers to whom the subject mortgage applications were assigned, deliberately and unlawfully

    a.  failed to adequately and properly consider their applications in light of FHA' underwriting guidelines, and

    b.  subjected those applications to discriminatory and onerous non-FHA underwriting requirements,

even though pursuant to FHA guidelines, the type of proposed acquisitions and renovations, residential conversions, loan limits, down payments, closing costs, interest rate buy-down, debt ratios, collateral values, credit scores and gross qualifying incomes, were actually encouraged and promoted, not problematic.

40

Plaintiffs also enumerate a couple more specific allegations of their disparate treatment claim that relative to the "protected-class" of African-Caribbean Americans, in particular and other minorities in general, the Bank RICO Enterprises, specifically and American Banks generally, have for many years deliberately

1. made FHA mortgage loans for 3-4 family properties particularly unavailable to class members,

2. prevented class members from obtaining home loans at market rates, and

3. failed to provide class members with housing loans in a nondiscriminatory manner.

**Wells Fargo NA; Officers Doe 1 through 5, individually and Jeff Doocy**

Fair Housing Act, 42 U.S.C. §§§ 3601 *et seq.*; ECOA, 15 U.S.C. § 1691(a)(1); Bivens, Bivens

Conspiracy; *Equal Protection, Procedural and Substantive Due Process Clauses* of the 5th

Amendment as incorporated in the 14th Amendment; as well as 42 USC §§§§§ 1981, 1982, 1985,

1986 and 1986; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, Title VIII of the

Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.*, the Civil Rights Act of 1871, 42 U.S.C.; state law

fraud, conspiracy; aiding and abetting, fraudulent concealment and deceptive business practices

act ("*New York Consumer Fraud Act*").

Plaintiffs hereby realleges:  Sections A, C, E, Ln 6 through 31; and F

-----------------------

**CLAIMS TWENTY FIVE – FORTY SIX**

**New Penn Financial; Officers Doe 1 through 5, individually and Merissa Serna**

Fair Housing Act, 42 U.S.C. §§§ 3601 *et seq.*; ECOA, 15 U.S.C. § 1691(a)(1); Bivens, Bivens

Conspiracy; Equal Protection, Procedural and Substantive Due Process Clauses of the 5th

Amendment as incorporated in the 14th Amendment; as well as 42 USC §§§§§ 1981, 1982, 1985,

1986 and 1986; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, Title VIII of the

Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.*, the Civil Rights Act of 1871, 42 U.S.C.; state law

fraud, conspiracy; aiding and abetting, fraudulent concealment and deceptive business practices

act ("New York Consumer Fraud Act").

Plaintiffs hereby realleges:  Sections A, C, E, Ln 32 through 78; and F

### CLAIM FORTY SEVEN – SIXTY EIGHT

### Financial Equities Mortgage Bankers; Officers Doe 1 through 5, individually and Tom Marino

Fair Housing Act, 42 U.S.C. §§§ 3601 et seq.; ECOA, 15 U.S.C. § 1691(a)(1); Bivens, Bivens

Conspiracy; Equal Protection, Procedural and Substantive Due Process Clauses of the 5th

Amendment as incorporated in the 14th Amendment; as well as 42 USC §§§§§ 1981, 1982, 1985,

1986 and 1986; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., Title VIII of the

Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq., the Civil Rights Act of 1871, 42 U.S.C.; state law

fraud, conspiracy; aiding and abetting, fraudulent concealment and deceptive business practices

act ("New York Consumer Fraud Act").

Plaintiffs hereby realleges:  Sections A, C, E, Ln 80 through 108; and F;

## CLAIMS SIXTY NINE – NINETY

### *Universal Mortgage Bankers, Norman Calvo and Officers Doe 1 through 5, individually*

Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*; ECOA, 15 U.S.C. § 1691(a)(1); Bivens, Bivens

Conspiracy; Equal Protection, Procedural and Substantive Due Process Clauses of the 5th

Amendment as incorporated in the 14th Amendment; as well as 42 USC §§§§§ 1981, 1982, 1985,

1986 and 1986; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.,* Title VIII of the

Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.,* the Civil Rights Act of 1871, 42 U.S.C.; state law

fraud, conspiracy; aiding and abetting, fraudulent concealment and deceptive business practices

act ("New York Consumer Fraud Act").

Plaintiffs hereby realleges:  Sections A, C, E, Ln 110 through 135; and F;

### CLAIMS NINETY ONE – ONE HUNDRED TWELVE

### *Belle Maison Realty, J.R. Nazaire, Officers Doe 1 through 5, individually and Sealy Alister; Annan Vivian; Mortgage Electronic Registration Systems, Inc (MERS) and New York State Licensing Division*

Fair Housing Act, 42 U.S.C. §§§ 3601 *et seq.*; ECOA, 15 U.S.C. § 1691(a)(1); Bivens, Bivens

Conspiracy; Equal Protection, Procedural and Substantive Due Process Clauses of the 5th

Amendment as incorporated in the 14th Amendment; as well as 42 USC §§§§§ 1981, 1982, 1985,

1986 and 1986; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.,* Title VIII of the

Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.*, the Civil Rights Act of 1871, 42 U.S.C.; state law fraud, conspiracy; *aiding and abetting, fraudulent concealment and deceptive business* practices act ("New York Consumer Fraud Act") and New York Executive Law § 296(5)(a)(1); tortuous interference with contract, and for declaratory and injunctive relief.

Plaintiffs hereby realleges:  Sections A, C, E, Ln 138 through 250; and F;

1     Plaintiffs sets forth that

2     3.  as African-Caribbean and Middle Eastern Americans, they are members of a class

3          protected by the statute,

4     4.  a dual agency existed between Defendant BMR and the Defendant property owner, as

5          well as Defendant BMR and the Defendant lender.

6     5.  they sought and was qualified to purchase the property located at 964 Madison

7          Avenue, Brooklyn, NY,

8     6.  Defendants made material omissions/misrepresentations,

9     7.  Defendants fraudulently concealed material facts,,

10    8.  they were rejected only after

11        a.  meeting with the Real Estate RICO Enterprise' Associate Broker, Alister for the

12            property inspection on or about November 23, 2011,

13        b.  providing the <u>mandatory</u>

14            i.  proof of funds for an "all-cash" purchase, or

15            ii.  FHA 203k mortgage preapproval letter.

16        Plaintiffs submitted two separate FHA 203k mortgage preapproval letters in the

17        *amount of Three Hundred Eighty Nine Thousand Dollars ($389,000.00),*

18            c.   providing a written binder accepting the offer to sell for the full net asking price of

19            Two Hundred Ninety Nine Thousand Dollars ($299,000.00), with a 45 day closing.

20        The Plaintiffs contend, *inter alia,* that the real estate RICO Defendants' defrauded them of

21        contractual equity/value in the property binder acceptance and deprived them of fair and equal

22        opportunity to purchase, by imposing conditions and terms on the acquisition of said property,

23        such that ostensibly available property, is effectively unavailable to them and other members of

24        the statutorily protected group, these includes but are not limited to:

25            1.  refusing to submit Plaintiffs' full acceptance binder to the owner and the foreclosing

26            bank, MERS within 24 hours, in the first instance;

27            2.  refusing to facilitate the sale of 964 Madison Avenue, Brooklyn, NY, after Plaintiffs

28            *personally inspected the property and submitted their unconditional and full*

29            acceptance of the offer to sell for Two Hundred Ninety Nine Thousand Dollars

30            ($299,000.00),

31            3.  *further holding Plaintiffs' acceptance binder for seven (7) additional days while*

32            actively soliciting and structuring a Two Thousand Dollar ($2,000.00) higher

33            subsequent offer, on arguably better terms;

34            4.  *making the proprietary decision, as to which offer the Seller will accept,*

35            5.  failing to advised them of material and essential terms of sale, complained of herein,

36            6.  refusing to accept Plaintiffs' countering "triple net" purchase offer of Three Hundred

37            *Five Thousand Dollars ($305,000.00) against the new Buyer' ultimately successful*

38    offer of Three Hundred One Thousand ($301,000.00) – in light of the fact that any
39    seller interested in concluding the "best deal" possible presumably would welcome

40    additional, higher bids,

41    7.  making tardy demands for the purchase be made on more onerous and discriminatory

42    terms. e.g.

43    a.  "all cash,"

44    b.  quite claim title subject to all unknown or unrevealed material facts, and

45    c.  subject to "time of the essence",

46    9.  falsely stating that the property was no longer available, when in fact, it was still not

47    in contract as of December 1, 2011,

48    10. failing to be professional, courteous, honest, fair and truthful,

49    all constituting serious departures from the prevailing real estate customs of Kings County NY,

50    created inferences of capricious and intentionally discriminatory sales practices. Furthermore,

51    the phantom or unidentified Buyer(s) were afforded the benefits of insider information that

52    could only be provided by the Real Estate RICO Defendants in closely structuring the better terms

53    of his/her/their offer.

54    Annan Vivian is hereby sued on the liability theory as owner; master-agent and co-

55    conspirator with BMR and to stay or undo the sale to any third party; MERS is hereby sued on the

56    liability theory as mortgage lender, master-agent capacity with BMR and to stay the foreclosure

57    or short sale; New York State Licensing Division is hereby sued for their failure to properly

58    supervise, investigate and/or censor the Defendants after a formal complaint had been filed.

US Department of Housing Urban and Development (HUD), the Secretary of (HUD), the Regional and Local Administrators of (HUD) responsible for the FHA mortgage program, in their official capacities and individually

Administrative Procedure Act ("APA"), 5 U.S.C. §§§ 701-706; National Housing Act, 12 U.S.C. §§ 1708, 1709; Fair Housing Act, 42 U.S.C. §§§ 3601 et seq.; ECOA, 15 U.S.C. § 1691(a)(1); Bivens, Bivens Conspiracy; Equal Protection, Procedural and Substantive Due Process Clauses of the 5th Amendment as incorporated in the 14th Amendment; as well as 42 USC §§§§§ 1981, 1982, 1985, 1986 and 1986; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq., the Civil Rights Act of 1871, 42 U.S.C.;

1       Plaintiffs hereby realleges:  Section A, Ln 1 through 18; Section C, Ln 1 through 64; Section

2       E, Ln 133 through 181; Section F, Lines 17 through 40; Section G, Ln 1 through 74; Section H, Ln 1

3       through 11;

4       Plaintiffs sets forth that pursuant to 12 U.S.C. § 1709, through the Federal Housing

5       Administration ("FHA"), the Secretary of HUD is authorized to insure mortgages and administer

6       rehabilitation loans to home-buyers that wish to purchase houses in need of repair or

7       modernization, but who cannot afford the interim financing necessary to do either.

8       In the spirit of statutory mandates designed to eradicate the "badges and incidences of

9       slavery," Plaintiffs hereby alleges that HUD, as a federal funding agency, its Secretary, as well as,

10   Regional and Local Directors, responsible for the FHA program, as the *"Gate-Keepers,"* et al,

11   knowingly and willfully conspired to

1. abdicate and did abdicate its duty to *"affirmatively further"* the goals of the Fair Housing Act (FHA),

2. impose and did impose a new facially neutral but discriminatory policy change – in allowing unlawful discriminatory lender overlays that serves no affirmative or legitimate governmental purpose, but in fact, has a disparate impact on the very people that the Fair Housing Act (FHA) was designed to help,

3. impose and did more recently impose a new facially neutral but discriminatory underwriting change, which has a disparate impact on a protected class of lower income loan applicant, because it increases the monthly mortgage payment by 1.1% to cover the "mortgage insurance premium," notwithstanding a down payment equal to or greater than 20%.

4. fail and did fail to discharge duties under certain provisions of the National Housing Act, 12 U.S.C. §§ 1708 and 1709; by not affirmatively

   a. warning prospective purchasers/borrowers of known redlined areas and substantial risk to them of the dangers of falling prey to discriminatory lending schemes, and

   b. creating a HUD anti-discriminatory attestation form be rated and signed by all loan applicants – a fair housing and equal credit opportunity monitoring system.

30   Plaintiffs hereby sues HUD, its Secretary, et al.,

49

5. for discrimination and facilitating, enabling, participating, encouraging and/or perpetuating Bank RICO Defendants' discriminatory practices. See _Gautreaux v. Romney,_ 448 F.2d 731, 740 (7th Cir. 1971) (upholding Title VI lawsuit against Secretary of HUD for perpetrating racially discriminatory conduct).

6. to compel the agency to permanently ban the Bank RICO Enterprises and other such violators from the federally insured mortgage program.

7. seeking this Court' issuance of a declaratory judgment: that HUD'

   a. imposition of a policy that in effect authorizes lenders to overlay FHA guidelines with discriminatory rules, and/or

   b. failure to exercise due diligence in affirmatively preventing discrimination against the statutorily protected class, for which the Fair Housing Act ("FHA") and the federally insured mortgage program was created,

   constitutes an abuse of discretion.

8. seeking this Court' issuance of such orders and directions to the HUD Secretary as are necessary to compel those subordinates charged with administering the FHA mortgage insurance program to affirmatively exercise reasonable care and due diligence that will prevent or substantially reduce the risk of arbitrary and capricious underwriting, leading to the herein complained of discrimination, and

9. seeking a mandatory injunction under the Fair Housing Act, 42 U.S.C. §§ 3601 _et seq.,_ enjoining HUD from future discrimination and facilitating, enabling, participating, encouraging and/or perpetuating discriminatory lending practices.

50

52        Plaintiffs allege that HUD, as a federal funding agency, served as a joint actor, aider and

53     abettor that assisted the funding recipients, by nurturing the discriminatory conduct. _Young v._

54     _Pierce,_ 544 F.Supp. 1010, 1015 (E.D.Tex. 1982).

55        Plaintiffs, as otherwise qualified and responsible home seekers were denied FHA' source

56     of credit, without proper regard for their capacity to repay the loans, thereby raising serious

57     federal questions and fair housing concerns that if proven, effectively

58        1.  contravenes Congressional intent embodied in the National Housing Act, the Fair

59             Housing Act, Title VI, Title VIII and other anti-discrimination legislation upon which this

60             suit is brought, by imposing the very "badges and incidences" of slavery the legislation

61             was designed to eradicate, and

62        2.  undermines our nation's recovery efforts.

63        Plaintiffs set forth as a preliminary matter of law that pursuant to its mandate, HUD must

64     enforce the nation's housing laws and follow its own rules, which _inter lia.,_ requires a minimum

65     FICO credit score of 580, a maximum debt-to-income (DTI) of 47% and a maximum HOC of 85%

66     for 3-4 family properties; yet HUD RICO Defendants permit, facilitate or sanctions, the Bank RICO

67     Defendants' discriminatory imposition of a significantly higher score, lower DTI and lower, if any

68     HOC.

69        Plaintiffs have a justifiable expectation that the FHA loan rules have the force of law and

70     final say in such matters, but the truth is that HUD, as a funding agency in the face of this nation's

71     long history of racial discrimination and need to spur the housing recovery, has

72     completely abdicated its mandate and "*affirmative duty to further*," the twin goals of the

73     *Fair Housing Act, and*

74     2.  adopted facially neutral policies, customs or actual practices that operates in

75         contravention of the Act and rather now

76             a.  *brings the FHA program into conformity with banking industry practices, which has*

77                 historically been disparate in its treatment and/or impact on a statutorily protected

78                 class, , and

79             b.  *retards the nation's housing recovery, by preventing class members from taking*

80                 advantage of historically low mortgage rates and lower cost homes.

81         It is with HUD' authorization and permission that Bank RICO Defendants freely contravene

82     the law with impunity, by requiring, *inter lia, the same higher FICOs, DTIs and lower, if any, HOC*

83     that the FHA program was designed to mitigate against. The caveat is that these policy overlays

84     must be applied equally to all applicants, do not plainly violate fair housing laws, and can

85     arguably be presented as "*reasonable and customary*" *in the industry.*

86     Plaintiffs set forth that

87             1.  what the banking industry deems to be "reasonable and customary" practices for

88                 "whites," historically has had a disparate impact on African-Americans,

89             2.  each of these HUD authorized policy overlays are consumer-oriented with major

90                 market impact, yet they remain undisclosed and are routinely applied by loan officers

91                 and underwriters alike, in an arbitrary, capricious and discriminatory manner, and

92             3.  these policies or actual practices are intended to and does have a disparate impact on

93                 a statutorily protected class.

52

94    Furthermore, the FHA program itself is the product of an arsenal of legislative enactments,

95    designed as the first line of

96         1.  defense in combating, and

97         2.  offense, charged with totally defeating,

98    what has become institutionalized discriminatory practices. HUD alone has the affirmative duty

99    to ensure that the federal government does not financially participate in or otherwise support

100   the discriminatory practices of others, by barring all violators of law from

101        1.  borrowing money from the U.S. Treasury at the discount rate, and

102        2.  selling their mortgages to Fannie Mae,

103        3.  participation in the FHA program. and

104        4.  substantial civil penalties any other tools available.

105        The instant case as well as other cited cases, HUD was a partner in discrimination, and

106   should be held responsible for this complicity. Title VI and VIII of the Civil Rights Act creates

107   affirmative duties for HUD to eliminate discrimination based on a number of factors therefore,

108   this instant private right of action against HUD as a federal funding agency is implied according to

109   precisely the same logic which justifies the private right of action against the recipients of federal

110   aid. *See, e.g., Little Earth of United Tribes, Inc. v. U.S. Dept. of Housing & Urban Dev.,* 584 F.Supp.

111   1292, 1297 (D.Minn.1983) (denying summary judgment on Title VI claim against HUD on the

112   grounds that plaintiffs alleged that "the agency itself has violated the federal statute").

113         Here, Plaintiffs set forth that the HUD Secretary, was not only aware of the long history of

114    slavery here in America and the more recent institutionalized propensity to impose its badges

115    and incidences, but lead the charge in discriminatory practices with a disparate impact, in that

116         1.  HUD as the Funding Agency, itself effectively imposed higher mortgage rates through

117             insurance premiums on 30 year loans with down payments of 20% or more, and

118         2.  HUD enabled its lenders, by sanctioning their use of facially neutral but discriminatory

119             underwriting policy overlays that was only limited by the lenders' lack of ingenuity.

120    that violated Plaintiffs' rights,

121         In the instant case, Plaintiffs applied for the FHA insured mortgages as they were required

122    to and did submit application data including specific details about employment, income, and the

123    sources of that income. FHA income requirements include dollar amounts, history, sources and

124    stability of Plaintiffs' income from employment listed on the Uniform Mortgage Application

125    (UMA) and as in the instant circumstances prospective rental income from 3-4 family property,

126    subject only to a HOC of 85% (FHA' gross vacancy and maintenance adjustment) must also be

127    included for mortgage qualifying purposes.

128         FHA guidelines provided Plaintiffs with a maximum debt-to-income ratio (DTI) of 47% --

129    the amount of money going out versus the amount of money coming in, which must be

130    calculated using all verifiable and reliable income, including in this instance, Plaintiffs' long term

131    employment through a temp agency. The FHA has rules about the nature of the income that can

132    be used for this calculation. Specifically, as listed in HUD 4155.1 4.D.1., income may be used in

133    calculating the borrower's income ratios if it comes from any source that

1.  can be verified

135    2.  is stable, or

136    3.  will continue.

137    It's also important to note that the "stable and likely to continue" requirement does not

138    necessarily take into account the length of time Plaintiffs has been in his, her or their current

139    jobs. In order for Plaintiffs to be eligible for a mortgage, FHA does not require

140    1.  a minimum length of time that Plaintiffs must have held a particular position of

141    employment, or

142    2.  that Plaintiffs' employment be from a single employer vis a vis multiple employers or

143    a temp agency,

144    therefore the Bank RICO Defendants were constrained to simply verifying the Plaintiffs'

145    continuous employment for the most recent two full years.

146    Plaintiffs set forth that notwithstanding Wells Fargo' arbitrary, capricious and

147    discriminatory application of FHA' underwriting criteria, they still qualified with a 42.89% DTI,

148    which was certainly below Defendant' required 43% DTI, (see attached Exhibit 1-A2,) but was still

149    denied access to the FHA source of credit, because the Defendants would only use either

150    1.  the conventional 75% HOC, or

151    2.  Plaintiffs' gross personal income,

152    but not both in combination, as it should be for mortgage qualifying purposes. This adverse

153    application of FHA' underwriting criteria, resulted in a reported DTI that exceeded 60% and

55

154   triggered Defendants' additional demand for "compensating factors" such as a down payment

155   larger than the proposed 6.6% and a large non-gifted cash reserve.

156       Plaintiffs set forth that although FHA loans does have policy requirements, minimums, and

157   guidelines that must be followed, in practice, HUD does not *"affirmatively further"* the twin goals

158   of the Fair Housing Act, by using its leverage to enforce the nation's laws by compelling lenders to

159   uniformly

160       1.   offer all FHA insured loan products, and

161       2.   issue insured loans that fall within FHA guidelines, but outside the lender's usual

162            qualifying ratios,

163   without requiring "compensating factors" such as a larger down payment, large cash reserves or

164   other factors.

165       HUD was an *active participant* that could have altogether prevented or ended these

166   violations at any time by,

167       1   not imposing in the first instance or simply nullifying the mortgage insurance premium

168            rule change, and/or

169       2.   withdrawing the authorization for lender overlays

170   at any time. Consequently, its own discriminatory conduct in this respect is violative of 42

171   U.S.C.2000d.

172     Plaintiffs' allegations in this case also fall within the "narrow circumstances involving

173     allegations that HUD has `consciously and expressly' abdicated its enforcement duties; that it

174     acquiesced or actively participated in discriminatory practices." _Marlow v. U.S. Dept. of Educ.,_ 820

175     F.2d 581, 583 (2d Cir. 1987).

176                                 ---------------------------

177     Plaintiffs set forth that this Court' recognition of a private right of action against HUD in

178     this case furthers Titles VI and VIII' purpose of both avoiding the use of federal funds to

179     discriminate or support discrimination, providing Plaintiffs and similarly situated others with

180     effective protection against discriminatory lending practices.

181     Plaintiffs further contends that this conduct constitutes a blatant contravention of

182     governmental purpose in the Act and violation of law, in that HUD did not simply have some

183     general duty of oversight, there was and still remains an affirmative and specific legal duty to

184     oversee and further the goals of the FHA program. For this abdication of a known legal duty, the

185     Secretary is not shielded, but is liable.

186     Specifically, Plaintiffs point to the fact that in conspiring with and/or acting on HUD'

187     behalf, each Bank RICO Defendant without supervision, was permitted to and did intentionally

188     pre-design and impose their own racially discriminatory lending policies that were overlaid on the

189     FHA' underwriting guidelines producing the desired disparate impact. These discriminatory

190     policy overlays penalized Plaintiffs and other similarly situated members of the statutorily

191     protected class -- constructively defeating the Congressional mandate and rule of law, to protect

192   this very class from the "badges and incidences of slavery," by rather *affirmatively furthering* the

193   *Fair Housing Act's statutory goals.*

194      Plaintiffs contend that HUD should have provided appropriate warnings to the protected

195   class of loan applicants and home buyers, because it had actual knowledge that the

196      1. targeted areas was "redlined," and

197      2. victims were low, moderate and middle income racial minorities ,

198      Furthermore the process HUD used to evaluate applications for mortgage insurance, omits

199   to exercise any or a sufficient amount of precaution or diligence against discriminatory practices,

200   notwithstanding their mandate to *affirmatively further*, which includes preventing contravention

201   of the goals of the Fair Housing Act.

202      Finally, although HUD' public policy statement is that it

203      1. provides non-discriminatory underwriting criteria for federally insured mortgage

204         loans, and

205      2. promotes fair and equal housing opportunities,

206   the actual private practice, custom and usage, is to authorize, permit and encourage individual

207   lenders to add-on an unmonitored over-layer of their own arbitrary, capricious and

208   discriminatory lending criteria, resulting in injury to the same statutorily "protected class" it is

209   charged with protecting, thus contravening both the National and Fair Housing Acts.

210      These permissive policies, customs or actual practices are unlawful and actually foster and

211   promote the very acts that Congress legislated against in the first instance.

58

212

213                                    *Title VI and Title VIII*

214         Title VI and Title VIII were enacted to protect and defend the rights of black persons to

215   equal treatment. The sweep of Title VI is broad, and is intended to eradicate discrimination from

216   all forms of social life. The statute explicitly enlists the power of federal funding agencies in this

217   program. Title VIII is narrower, and is more explicitly focused on providing "fair housing"

218   throughout the United States.

219         The legislative history of both statutes makes clear that their purpose is to erase the

220   legacy of racial segregation and discrimination, by equalizing the provision of services to all

221   persons within the jurisdiction of the United States, without regard to color.

222         HUD is bound by its own regulations to implement the objectives of Title VI and Title VIII,

223   as well as the general constitutional principle of equal protection of the laws. In this action,

224   Plaintiffs charge that HUD has wholly abrogated these affirmative duties in the State of New York

225   and elsewhere. The action is brought on behalf of Plaintiffs and as a class action, on behalf of

226   African-Caribbean and other minorities that are otherwise eligible for federally insured mortgage

227   loans and denied the benefits of such loans, in part because of HUD' own discriminatory actions

228   and in part, because of HUD' inaction.

229

230

231

**Civil Rights Act of 1866, 42 U.S.C. §§§§§ 1981, 1982, 1985, 1986 and 1988.**

233    Actions under these sections may properly be brought against federal agencies which have

234    allegedly contravened the guarantee of equal treatment. _Penn v. Schlesinger,_ 490 F.2d 700 (5th

235    Cir. 1973); _Baker v. F & F Investment Co.,_ 489 F.2d 829 (7th Cir. 1973) (_overruled on other_

236    _grounds, Beard v. Robinson,_ 563 F.2d 331 (7th Cir. 1977)). Whether the action or inaction of HUD,

237    as alleged by Plaintiffs in this action, constitutes a violation of the statutes is a factual matter that

238    must be determined after trial; plainly, though, the statutes provide a cause of action for racially

239    discriminatory conduct.

240

241                    **Fifth Amendment of the United States Constitution.**

242    Finally, Plaintiffs contend that action or inaction of HUD in relation to the imposing,

243    facilitating, encouraging or failing to affirmatively prevent same violates the rights secured to

244    them by the Fifth Amendment of the United States Constitution. It is beyond doubt that the due

245    process clause of that amendment incorporates the constitutional guarantee of racial equality.

246    Any classification that violates the equal protection clause of the Fourteenth Amendment

247    similarly offends the Fifth Amendment. _Richardson v. Belcher,_ 404 U.S. 78, 81, 92 S.Ct. 254, 257,

248    30 L.Ed.2d 231 (1972); _Johnson v. Robison,_ 415 U.S. 361, 364 n.4, 94 S.Ct. 1160, 1164 n.4, 39

249    L.Ed.2d 389 (1974). A cause of action against federal officials to redress alleged discrimination

250    may be implied directly under the Fifth Amendment. _Davis v. Passman,_ 442 U.S. 228, 99 S.Ct.

251    2264, 60 L.Ed.2d 846 (1979) (gender discrimination). If the actions of HUD here implicated would

252   constitute racial discrimination in violation of the guarantees of the Fourteenth Amendment,

253   relief may be granted plaintiffs directly under the Fifth Amendment.

254

255                                    <u>HUD Remedies</u>

256        Therefore, the remedies that Plaintiffs seek against HUD include a

257   1.  declaratory judgment that HUD'

258          a.  imposition of discriminatory underwriting terms,

259          b.  facilitation or allowance of arbitrary, capricious and discriminatory mortgage

260              underwriting overlays, by unmonitored participating banks, and/or

261   2.

262          a.  failure to exercise due diligence in the oversight of Bank RICO Defendants' FHA

263              mortgage lending practices,

264        constitutes an abuse of discretion.

265   3.  permanent prohibitory injunction against HUD conspiring with or otherwise facilitating or

266        permitting its approved lenders from imposing underwriting overlays that

267          a.  contravenes federal or state constitutions and laws inter lia, the Federal Housing

268              Act, Bivens, Bivens Conspiracy; the equal protection, procedural and substantive

269              Due Process Clauses of the 5th and 14th Amendments', etc.

270          b.  has a disparate and discriminatory impact on protected classes, in violation of 42

271              USC § 1981, § 1982, § 1983 or § 1985

272    4. permanent mandatory injunction compelling HUD to affirmatively exercise such

273       reasonable care and due diligence as will prevent discriminatory lending schemes in the

274       future.

275    5. elimination of the new mortgage insurance policy as it relates to those applying for a 30

276       year mortgage with at least a 20% down payment, and

277    6. a refund of mortgage insurance premiums to those that did make a down payment of

278       20% or more.

279       The APA provides for "any applicable form of legal action, including actions for declaratory

280    judgments or mandatory injunction." 5 U.S.C. § 703; _Hurley v. Reed,_ 288 F.2d 844, 846

281    (D.C.Cir.1961) ("[t]he legislative history of the [APA] shows that review of administrative

282    adjudications by an action for declaratory judgment was deliberately provided to protect any

283    person suffering legal wrong from rulings of administrative agencies").

### G. Supervisory Liability

Fair Housing Act, 42 U.S.C. §§§ 3601 *et seq.,*; ECOA, 15 U.S.C. § 1691(a)(1); Bivens, Bivens

Conspiracy; Title IV and Title VIII; 42 USC § 1981, § 1982, § 1985, § 1986, § 1988; and New York

Law Violations

1    Plaintiff hereby realleges Sections A through F above and seeks to impose liability on all

2  official capacity and supervisory Defendants, because

3      1.  they created the policies, encouraged the customs and oversaw the unlawful actual

4         practices, and

5      2.  supervisors themselves violated the law; knew or should have

6          a.  known *inter lia.,* anti-discrimination laws were being violated, and

7          b.  prevented management and/or subordinates from such violations leading to

8              deprivation of Plaintiffs money, property, rights, privileges and immunities.

9  The supervisory liability doctrine, under which the Plaintiffs wishes to hold the supervisors liable

10  was clearly established at the time of injury, e.g. Plaintiff' statutory rights to equal protection

11  under the law, equal credit opportunities, fair housing opportunities, rights to property

12  ownership, contract, substantive and procedural due process, under the 5th and 14th

13  Amendments.

14    Furthermore, Plaintiffs, sets forth that while there is no Federal respond eat superior

15  liability for the actions of these particular – official capacity Defendants, New York State law

16  permits the imposition of derivative liability on their employers. Therefore, Plaintiffs seek

17  imposition of such liability on supervisory Defendants in all causes of action, in that the

18  discriminatory practices also violated written NYC and NYS policies, the Defendants may appear

19  to (but does not) have a defense to this liability, depending on a jury's findings about the actual

20  "customs and practices."

21       Plaintiff contends that the officers, policy-makers, administrators and management

22  supervisors are all liable because they had actual or constructive knowledge/notice that it was

23  highly likely his/her/their subordinates, while on duty, might violate the rights of Plaintiffs and

24  those similarly situated to, supra, but the supervisors deliberately or recklessly disregarded that

25  risk by failing to take reasonable action to prevent such a violation, and that failure caused

26  constitutional injuries to the Plaintiffs and those that are similarly situated.

27

### H. Common Law Fraud

1  Plaintiffs set forth that the Defendants

2    1. were in actual possession of superior knowledge, not readily available to the Plaintiffs,

3      the information was fraudulently concealed from Plaintiffs,

4    2. knew that the Plaintiffs would act to their detriment on the basis of this mistaken

5      knowledge.

6    3. was under a known duty to disclose material and/or adverse information,

7    4. knowingly and intentionally breached that known duty.

8    5. knowingly and intentionally participated in a civil conspiracy to commit fraud.

9      6.  engaged in acts or practices that were consumer-oriented and had a broad impact on

10      consumers,

11    7.  caused injuries as outlined herein, and

12    8.  departed from the ideals embraced within their respective pledges to Codes of Ethics.

## AFFIRMATION

Plaintiff, Ezekiel Frederick, pro se, hereby affirms that the foregoing is true

and correct to the best of my knowledge pursuant to the penalty of perjury.


Kings County, NY

Dated: February 3, 2012

Ezekiel Frederick, Pro Se

900 Main Street, Suite C-54

Roosevelt Island, NY 10044

privateusattorneygeneral@hushmail.com